IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANGELA TRULOVE,                    )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )        Case No. 08-1020-MLB
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of                    )
Social Security,                   )
                                   )
                    Defendant.     )
_____   )


RECOMMENDATION AND REPORT


     This is an action reviewing the final decision of the
Commissioner of Social Security denying the plaintiff
supplemental security income payments.  The matter has been fully
briefed by the parties and has been referred to this court for a
recommendation and report.

**I.  General legal standards**

     The court's standard of review is set forth in 42 U.S.C.
§ 405(g), which provides that "the findings of the Commissioner
as to any fact, if supported by substantial evidence, shall be
conclusive."  The court should review the Commissioner's decision
to determine only whether the decision was supported by
substantial evidence and whether the Commissioner applied the

1

correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the conclusion.  The determination of whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it really constitutes mere conclusion.  Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).  Although the court is not to reweigh the evidence, the findings of the Commissioner will not be mechanically accepted.  Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. Graham v. Sullivan, 794 F. Supp. 1045, 1047 (D. Kan. 1992).  The court should examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision and, on that basis, determine if the substantiality of the evidence test has been met.  Glenn, 21 F.3d at 984.

The Social Security Act provides that an individual shall be determined to be under a disability only if the claimant can establish that they have a physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial

2

gainful activity (SGA).  The claimant's physical or mental impairment or impairments must be of such severity that they are not only unable to perform their previous work but cannot, considering their age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d).

The Commissioner has established a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the Commissioner will not review the claim further.  At step one, the agency will find non-disability unless the claimant can show that he or she is not working at a "substantial gainful activity."  At step two, the agency will find non-disability unless the claimant shows that he or she has a "severe impairment," which is defined as any "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled.  If the claimant's impairment does not meet or equal a listed impairment, the inquiry proceeds to step four, at which the agency assesses whether the claimant can do his or her previous work; unless the claimant shows that he or she cannot perform their previous work, they are determined not

to be disabled.  If the claimant survives step four, the fifth and final step requires the agency to consider vocational factors (the claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. Barnhart v. Thomas, 124 S. Ct. 376, 379-380 (2003).

The claimant bears the burden of proof through step four of the analysis.  Nielson v. Sullivan, 992 F.2d 1118, 1120 (1993). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy.  Nielson, 992 F.2d at 1120; Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  The Commissioner meets this burden if the decision is supported by substantial evidence. Thompson, 987 F.2d at 1487.

Before going from step three to step four, the agency will assess the claimant's residual functional capacity (RFC).  This RFC assessment is used to evaluate the claim at both step four and step five.  20 C.F.R. § 404.1520(a)(4); 404.1520(f,g).

**II.  History of case**

On August 27, 2007, administrative law judge (ALJ) Robert J. Burbank issued his decision (R. at 25-35).  At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since June 29, 2005, the application date (R. at 27). At step two, the ALJ found that plaintiff had the following

4

severe impairments: degenerative disc disease of the cervical and lumbar spine, status/post right shoulder arthroscopic repair, asthma, osteoarthritis of the right wrist status/post surgical repair, right carpal tunnel syndrome, headaches, and obesity. The ALJ further found that plaintiff had nonsevere impairments of hypertension, hypothyroidism, GERD, and a mental disorder (R. at 27).  At step three, the ALJ determined that plaintiff's impairments do not meet or equal a listed impairment (R. at 29). After determining plaintiff's RFC (R. at 30), the ALJ found at step four that plaintiff was able to perform past relevant work as a parts clerk, as actually performed by the plaintiff, and as a telemarketer, a dispatcher, and a debt collector (R. at 33). Therefore, the ALJ concluded that plaintiff was not disabled (R. at 35).

**III.  Did the ALJ err in his evaluation of the opinions of Dr. Ryder, a licensed treating psychologist?**

The opinions of physicians, psychologists, or psychiatrists who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant.  The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.

Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004).  A
treating physician's opinion about the nature and severity of the
claimant's impairments should be given controlling weight by the
Commissioner if well supported by clinical and laboratory
diagnostic techniques and if it is not inconsistent with other
substantial evidence in the record.  Castellano v. Secretary of
Health & Human Services, 26 F.3d 1027, 1029 (10th Cir. 1994); 20
C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  When a treating
physician opinion is not given controlling weight, the ALJ must
nonetheless specify what lesser weight he assigned the treating
physician opinion.  Robinson v. Barnhart, 366 F.3d 1078, 1083
(10th Cir. 2004).  A treating source opinion not entitled to
controlling weight is still entitled to deference and must be
weighed using all of the following factors:

(1) the length of the treatment relationship and the frequency of
examination;
(2) the nature and extent of the treatment relationship,
including the treatment provided and the kind of examination or
testing performed;
(3) the degree to which the physician's opinion is supported by
relevant evidence;
(4) consistency between the opinion and the record as a whole;
(5) whether or not the physician is a specialist in the area upon
which an opinion is rendered; and
(6) other factors brought to the ALJ's attention which tend to
support or contradict the opinion.

Watkins v. Barnhart, 350 F.3d 1297, 1300-1301 (10th Cir. 2003).

     After considering the above factors, the ALJ must give good
reasons in his decision for the weight he ultimately assigns the
opinion.  If the ALJ rejects the opinion completely, he must then

give specific, legitimate reasons for doing so.  Watkins, 350 F.3d at 1301.

An ALJ must evaluate every medical opinion in the record, although the weight given to each opinion will vary according to the relationship between the disability claimant and the medical professional.  Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004).  In the determination of issues reserved to the Commissioner, such as opinions regarding: whether an impairment meets or equals a listing, plaintiff's RFC, whether a plaintiff can do past relevant work, how age, education, and work experience apply, and whether a plaintiff is disabled, treating source opinions are not entitled to special significance or controlling weight.  Soc. Sec. Rul. 96-5p, (Medical Source Opinions on Issues Reserved to the Commissioner), 1996 WL 374183, at *2.  However, even on issues reserved to the Commissioner, including the RFC determination and the ultimate issue of disability, opinions from any medical source must be carefully considered and must never be ignored.  Social Security Ruling (SSR) 96-5p, 1996 WL 374183 at *2-3.

Dr. Ryder prepared a medical source statement-mental, in which he found that plaintiff was extremely limited in 2 categories, markedly limited in 5 categories, and moderately limited in 9 categories (out of 20 categories) (R. at 199-200). The ALJ evaluated the opinions of Dr. Ryder as follows:

Jamie A. Ryder, Ph.D., the claimant's therapist, completed a medical source statement-mental- on February 15, 2006 reporting that the claimant is extremely limited in the ability to accept instructions, respond appropriately to criticism from supervisors, or travel in unfamiliar places or use public transportation, and markedly limited in the ability to perform mental functions related to adaptation and sustained concentration and persistence, as well as moderately limited in most other areas of mental functioning (exhibit B11F). Dr. Ryder assigned a GAF of 41 to 50 (exhibit14F), indicating disabling functional limitations. **The claimant saw Dr. Ryder on January 19 and 22, 2006, but did not return for further treatment sessions** (exhibit 14F). Thus, this opinion was issued after only visits and did not represent a longterm treatment history. **This opinion is not consistent with Dr. Ryder's objective findings that the claimant had logical, coherent, and goal directed thought processes with normal thought content and psychomotor functioning and average intellectual functioning, but variable attention and concentration** (exhibit B14F). The claimant stated on a function report that she could pay attention up to 2 hours, which she considered normal, had no difficulty following written and oral instructions, and handled changes in routine without problem. She denied problems getting along with authority figures or having ever lost a job due to problems getting along with others (exhibit B3E). Richard E. Rattay, M.D., who treated the clamant in 2005 and 2006, stated that the claimant had normal attention span, concentration, mental status, judgment, and immediate, recent, and remote memory as well as mood and affect (exhibits B4F/24,24; B13F). Dr. Rattay also noted that the claimant had normal capacity for sustained mental activity and abstract thinking (exhibit B13F/102). **Dr. Ryder's opinion is not entitled to controlling weight**

> **because it is not supported by his objective
> treatment records.** His opinion is not based
> upon a longstanding treatment history and is
> inconsistent with the claimant's allegations
> and the findings of Dr. Rattay. Therefore, it
> has not been given substantial weight in any
> aspect.

(R. at 34-33, emphasis added).

However, a review of the treatment records of Dr. Ryder
demonstrate that the ALJ has misstated the evidence, and failed
to discuss any of the evidence which would support the findings
of Dr. Ryder.

The ALJ stated that Dr. Ryder only saw plaintiff on January
19 and 22, 2006 (R. at 34).  However, Dr. Ryder's records
indicate that he saw the plaintiff on November 22, 2005 (R. at
244-246), December 15, 2005 (R. at 243), and January 19, 2006 (R.
at 242).  Thus, it is not at all clear that the ALJ reviewed all
of the treatment records of Dr. Ryder when he issued his
decision.

The ALJ also found that Dr. Ryder's opinions of extreme,
marked and moderate limitations were not consistent with Dr.
Ryder's objective findings that plaintiff had logical, coherent,
and goal directed thought processes with normal thought content
and psychomotor functioning and average intellectual functioning,
but variable attention and concentration (R. at 34).  However,
the ALJ failed to mention many of the following entries contained
in Dr. Ryder's treatment notes:

9

November 22, 2005: Presenting Problem:...The presenting clinical problem is depression, suicidal ideation, abused by ex-husband, anxiety...The primary clinical theme and problem discussed during the appointment was ongoing depressed mood with anxiety and some symptoms of post-traumatic stress disorder...**Approximately 2 years ago she left an extremely and physically abusive marriage. She reports that she had to be with her husband at all times and he would even go so far as to follow her into the bathroom so that he could always account for her whereabouts.  When she tried to leave him he became even more violent and beat her up several times...She reports that he has broken into her home and car and has attacked her on several occasions...The most recent attack happened about a month ago when he hit her head repeatedly against his car until she lost consciousness**...Symptoms observed or reported requiring current level of care include anger, anxiety, attention/concentration deficits, emotional [illegible], generalized anxiety, guilt, hopelessness, irritability, medical problems, memory problems, mood depressed, mood swings, paranoid ideation, sleep (onset delay/early awakened), social withdrawal, somatic concerns, trauma victim-emotional, trauma victim-physical, and trauma victim-sexual...

Observations/Mental Status:...Immediate attention and concentration was appeared variable. Level of intellectual functioning compared to same age peers was average range. Thought processes were found to be generally logical, coherent and goal directed...The predominant feature was that of depression with flat affect or expressiveness...Current destructive behavior patterns; suicidal ideation.  Past history of suicidal and homicidal ideation is positive for self-harm behaviors.  History of abuse. Disturbance in sleep patterns: poor sleep onset, difficulty staying asleep, early morning awakening, and frequent nightmares.

10

Family and Social Histories**:...She reports that she was physically and emotionally abused by the first man that she married...Her third marriage lasted 4 years and she left approximately 2 years after he tried to kill her.** She has filed a restraining order against him but that has not stopped him from threatening her and breaking into her home and car... **Approximately only a month ago he attacked her and beat her head into the back of a truck. She continues to experience headaches and memory problems from that attack...She cannot sleep at night because of fear that he will break into the house. When she does sleep she has constant nightmares about him attacking her.**

(R. at 244-245, emphasis added).

December 15, 2005: Subjective:...The primary clinical themes and problem discussed during the appointment was ongoing depression and anxiety...Symptoms observed or reported requiring current level of care include agitation, anhedonia, anger, anxiety, disorientation, derealization, depressed mood, distractibility, familial stress/strain, fatigue/low energy, generalized anxiety, grief, guilt, hopelessness, irritability, medical problems, memory problems, panic attacks, paranoid ideation, restlessness, social withdrawal, somatic concerns, trauma victim-emotional, trauma victim-physical, and worry...Current self-destructive behavior patterns/risk factors reported or indicated during session: none indicated. Level of functioning was low.

Assessment:...Angela appeared to have no significant change in emotional functioning since the last appointment...Overall, prognosis is uncertain at this time.

(R. at 243).

11

January 19, 2006: Subjective:...The primary
clinical theme and problem discussed during
the appointment was ongoing depression and
anxiety...**She had the first of several
surgeries this week to repair damage caused
by the abuse she suffered at the hands of her
former husbands**...Symptoms observed or
reported requiring current level of care
include agitation, anhedonia, anger, anxiety,
disorientation, derealization, depressed
mood, distractibility, familial
stress/strain, fatigue/low energy,
generalized anxiety, grief, guilt,
hopelessness, irritability, medical problems,
memory problems, panic attacks, paranoid
ideation, restlessness, social withdrawal,
somatic concerns, trauma victim-emotional,
trauma victim-physical, and worry**...**

Assessment:...Angela appears to be making
average progress towards treatment goals from
observations during today's appointment.
Angela appeared to have some improvement in
emotional functioning since the last
appointment...Angela's capacity to make
changes/decisions is fair.  Overall, progress
is good.

(R. at 242, emphasis added).  The diagnostic impressions after

each of the three sessions was major depression, post-traumatic

stress disorder, and an assignment of a GAF of 41-50[1] (R. at 245,

---

[1]GAF (global assessment of functioning) scores can be found
in the <u>Diagnostic and Statistical Manual of Mental Disorders</u>.
The scores in this case represent the following:

41-50: **Serious symptoms** (e.g., suicidal
ideation, severe obsessional rituals,
frequent shoplifting), **OR any serious
impairment in social, occupational, or school
functioning** (e.g., no friends, unable to keep
a job) (emphasis in original).

<u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM-IV-TR)

243, 242).

The ALJ failed to mention or disclose those portions of the treatment records by Dr. Ryder which provide some support for his findings of extreme, marked, and moderate mental limitations, including the evidence of severe physical and emotional abuse which has led to serious emotional problems and required several surgeries to repair the physical damage.[2]  The ALJ also failed to mention the long lists of symptoms requiring care which were mentioned by the psychologist.  An ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.  <u>Robinson v.</u>

---

(4th ed., text revision, American Psychiatric Association 2000 at 34) (emphasis in original).  Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.  A claimant's impairment might lie solely with the social, rather than the occupational sphere.  A GAF score of fifty or less, however, does suggest an inability to keep a job.  <u>Lee v. Barnhart</u>, 117 Fed. Appx. 674, 678 (10th Cir. Dec. 8, 2004).

[2]The ALJ also relied on medical reports from Dr. Rattay (a medical doctor) to discount the opinions of Dr. Ryder (a psychologist).  However, Dr. Rattay's reports never mention or discuss the physical and emotional abuse suffered by the plaintiff, or its impact on her ability to work.  Furthermore, there is no medical opinion evidence indicating that the findings of Dr. Ryder and Dr. Rattay cited by the ALJ in his decision are inconsistent with the opinions of Dr. Ryder that she has various extreme, marked, and moderate impairments.  For example, there is no clear contradiction between Dr. Ryder's statement that plaintiff had variable attention and concentration (R. at 244), which the ALJ cited to in his decision (R. at 34), and the specific finding of Dr. Ryder that plaintiff had a marked limitation in her ability to maintain attention and concentration for extended periods (R. at 199).

Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004); Chester v. Apfel, 1999 WL 360176 at *4 (10th Cir. June 4, 1999)(the ALJ may not use only portions of a report which are favorable to his decision, while ignoring other parts of the report).  For these reasons, this case should be remanded in order for the ALJ to give consideration to all aspects of the treatment notes of Dr. Ryder. On remand, the ALJ is reminded that if the ALJ believes that Dr. Ryder failed to provide sufficient support for his conclusions about the severity of plaintiff's mental limitations or the effect of those limitations on her ability to work, the ALJ should recontact Dr. Ryder for clarification of his opinions before rejecting them.  Robinson, 366 F.3d at 1084.

The ALJ also noted, without explanation, that plaintiff had discontinued therapy (R. at 32).  However, the ALJ failed to mention that plaintiff testified that she had discontinued therapy because she did not have medical insurance, and therefore could not be seen (R. at 268).  The 10th Circuit, relying on the case of Thompson v. Sullivan, 987 F.2d 1482, 1489-90 (10th Cir. 1993), has repeatedly held that the inability to pay may justify a claimant's failure to pursue or seek treatment.  Threet v. Barnhart, 353 F.3d 1185, 1190 n.7 (10th Cir. 2003); Norris v. Apfel, 215 F.3d 1337 (table), 2000 WL 504882 at *8 (10th Cir. Apr. 28, 2000); Smith v. Apfel, 149 F.3d 1191 (table), 1998 WL 321176 at *4 (10th Cir. June 8, 1998); Snead v. Callahan, 129

F.3d 131 (table), 1997 WL 687660 at *4 (10th Cir. Oct. 31, 1997);
see also Eason v. Chater, 951 F. Supp. 1556, 1562 (D. N.M.
1996)(claimant should not be penalized for failing to seek
treatment that they cannot afford); Hockenhull v. Bowen, 723 F.
Supp. 555, 557 (D. Colo. 1989) (evidence of nontreatment is of
little weight when claimant's failure to seek medical treatment
can be attributed to their inability to pay for such treatment).
Therefore, on remand, the ALJ must take into consideration
plaintiff's ability to pay for therapy when the ALJ points out
that plaintiff discontinued therapy.

**IV.  Did the ALJ err in making his RFC findings?**

Because of the errors made by the ALJ in evaluating the
opinions of Dr. Ryder, when this case is remanded, the ALJ will
have to make new findings in the five-step sequential evaluation
process (specifically, the ALJ shall make a new finding at step
two of whether plaintiff has a severe mental impairment),
including new credibility and RFC findings, after giving proper
consideration to the opinions of Dr. Ryder.

Plaintiff also argues that the state agency physical RFC
assessment, upon which the ALJ relied on in making his RFC
findings (R. at 33), failed to take into account medical evidence
submitted after the state agency assessment, and that this
subsequent medical evidence demonstrated more severe impairments.
However, plaintiff failed to cite to any medical opinion

indicating that the subsequent medical evidence is inconsistent with the state agency physical RFC findings.  In the absence of any citation to such medical opinion evidence, or any clear indication in the subsequent medical evidence that it is not consistent with the stage agency physical RFC assessment, the court will not engage in the task of weighing medical evidence in the first instance in order to determine whether or not subsequent medical evidence is or is not consistent with the state agency physical RFC assessment.

Finally, plaintiff contends that the ALJ erred in his finding that plaintiff is limited to work "which allows the option to alternate sitting and standing" (R. at 16) because it is not specific as to the frequency of the claimant's need to alternate sitting and standing.  This issue was previously addressed by the court in <u>Fairbanks v. Astrue</u>, Case No. 06-1206-MLB (D. Kan. June 12, 2007; report and recommendation at 6-9), and the relevant regulations and case law are again set forth below.

SSR 96-9p explains the Social Security Administration's policies regarding the impact of a RFC assessment for less than a full range of sedentary work.  On the issue of alternating sitting and standing, it states the following:

> An individual may need to alternate the
> required sitting of sedentary work by
> standing (and, possibly, walking)
> periodically. Where this need cannot be

16

accommodated by scheduled breaks and a lunch
period, the occupational base for a full
range of unskilled sedentary work will be
eroded. The extent of the erosion will depend
on the facts in the case record, such as the
frequency of the need to alternate sitting
and standing and the length of time needed to
stand. **The RFC assessment must be specific as
to the frequency of the individual's need to
alternate sitting and standing.** It may be
especially useful in these situations to
consult a vocational resource in order to
determine whether the individual is able to
make an adjustment to other work.

SSR 96-9p, 1996 WL 374185 at *7 (emphasis added).

SSR 83-12 discusses the use of the medical-vocational rules
as a framework for adjudicating claims in which an individual has
only exertional limitations within a range of work or between
ranges of work.  One special situation covered in SSR 83-12 is
the need to alternate between sitting and standing.  It states as
follows:

In some disability claims, the medical
facts lead to an assessment of RFC which is
compatible with the performance of either
sedentary or light work except that the
person must alternate periods of sitting and
standing. The individual may be able to sit
for a time, but must then get up and stand or
walk for awhile before returning to sitting.
Such an individual is not functionally
capable of doing either the prolonged sitting
contemplated in the definition of sedentary
work (and for the relatively few light jobs
which are performed primarily in a seated
position) or the prolonged standing or
walking contemplated for most light work.
(Persons who can adjust to any need to vary
sitting and standing by doing so at breaks,
lunch periods, etc., would still be able to
perform a defined range of work.)

17

> There are some jobs in the national
> economy--typically professional and
> managerial ones--in which a person can sit or
> stand with a degree of choice. If an
> individual had such a job and is still
> capable of performing it, or is capable of
> transferring work skills to such jobs, he or
> she would not be found disabled. However,
> most jobs have ongoing work processes which
> demand that a worker be in a certain place or
> posture for at least a certain length of time
> to accomplish a certain task. Unskilled types
> of jobs are particularly structured so that a
> person cannot ordinarily sit or stand at
> will.  In cases of unusual limitation of
> ability to sit or stand, a VS [vocational
> specialist] should be consulted to clarify
> the implications for the occupational base.

SSR 83-12, 1983 WL 31253 at *4.

In the case of Armer v. Apfel, 216 F.3d 1086 (table), 2000 WL 743680 (10th Cir. June 9, 2000), the ALJ found that the claimant was limited to unskilled sedentary work that would allow him to "change positions from time to time."  2000 WL 743680 at *2.  The court cited to the language quoted above in SSR 96-9p and held that the ALJ's finding that the claimant would have to change positions from time to time was vague and did not comply with SSR 96-9p.  Id. at *2-3.

In the case of Vail v. Barnhart, 84 Fed. Appx. 1, 2-3 (10th Cir. Nov. 26, 2003), the ALJ had made RFC findings limiting plaintiff to light work which included a limitation to allow plaintiff brief changes of position (alternating sitting and standing).  The court stated as follows:

> Furthermore, if an ALJ finds that a claimant

18

> cannot perform the full range of work in a
> particular exertional category, an ALJ's
> description of his findings in his
> hypothetical and in his written decision must
> be particularly precise. For example,
> according to one of the agency's own rulings
> on sedentary labor, the description of an RFC
> in cases in which a claimant can perform less
> than the full range of work "must be specific
> as to the frequency of the individual's need
> to alternate sitting and standing." Social
> Security Ruling 96-9P, 1996 WL 374185
> (S.S.A.) at *7. **Precisely how long a claimant
> can sit without a change in position is also
> relevant to assumptions whether he can
> perform light work.** 20 C.F.R. § 404.1567(b).

84 Fed. Appx. at **4-5 (emphasis added).  The court then held

that the ALJ made a critical omission in his analysis by not

properly defining how often the claimant would need to change

positions.  84 Fed. Appx. at *5.

In this case, the ALJ adopted RFC findings which limit

plaintiff to light exertional work.  The regulations and case law

are clear that the ALJ must be specific in setting forth the

frequency of a claimant's need to alternate between sitting and

standing.  Therefore, on remand, the ALJ shall include in his RFC

findings the specific frequency of plaintiff's need to alternate

sitting and standing in order to determine its impact on

plaintiff's ability to perform past work and/or other work in the

national economy.

**V.  Did the ALJ err in his analysis of plaintiff's credibility in
regards to pain?**

19

A reviewing court does not weigh the evidence and may not substitute its discretion for that of the agency.  Credibility determinations are peculiarly the province of the finder of fact, and a court will not upset such determinations when supported by substantial evidence.  However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.  Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  Furthermore, the ALJ cannot ignore evidence favorable to the plaintiff.  Owen v. Chater, 913 F. Supp. 1413, 1420 (D. Kan. 1995).

When analyzing evidence of pain, the court does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ will be deemed to have satisfied the requirements set forth in Kepler.  White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002); Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  An ALJ must therefore explain and support with substantial evidence which part(s) of claimant's testimony he did not believe and why.  McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002).  It is error for the ALJ to use standard boilerplate language which fails to set forth the specific evidence the ALJ considered in determining that a claimant's complaints were not credible.  Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004).  On the other hand,

an ALJ's credibility determination which does not rest on mere boilerplate language, but which is linked to specific findings of fact fairly derived from the record, will be affirmed by the court.  <u>White</u>, 287 F.3d at 909-910.

The court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1173 (10th Cir. 2005).  However, as noted above, the ALJ will need to make new credibility findings after giving proper consideration to the opinions of Dr. Ryder and the reasons provided by plaintiff for discontinuing therapy.

**VI.   Did the ALJ err in his step four analysis?**

At step four, the ALJ is required by Social Security Ruling (SSR) 82-62 to make findings of fact regarding: 1) the individual's residual functional capacity, 2) the physical and mental demands of prior jobs or occupations, and 3) the ability of the individual to return to the past occupation given his or her residual functional capacity.  <u>Henrie v. United States Dep't of HHS</u>, 13 F.3d 359, 361 (1993).  Thus, at the third or final phase of the analysis, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these three phases, the ALJ must make specific findings.  <u>Frantz v. Astrue</u>, 509 F.3d 1299, 1303 (10th Cir.

21

2007); <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1023 (10th Cir. 1996).[3]
An ALJ can comply with these requirements if he quotes the VE's
testimony with approval in support of his own findings at phases
two and three of the step four analysis.  <u>Doyal v. Barnhart</u>, 331
F.3d 758, 760-761 (10th Cir. 2003).[4]  At the second phase of the

---

[3]In <u>Winfrey</u>, the court noted that the Secretary glossed over
the absence of the required ALJ findings by relying on the
testimony of the vocational expert (VE) that plaintiff could meet
the mental demands of his past relevant work, given his mental
limitations as found by the ALJ.   The court stated that this
practice of delegating to a VE many of the ALJ's fact finding
responsibilities at step four appears to be of increasing
prevalence and is to be discouraged.   The court went on to say as
follows:

> Requiring the ALJ to make specific findings
> on the record at each phase of the step four
> analysis provides for meaningful judicial
> review.  When, as here, the ALJ makes
> findings only about the claimant's
> limitations, and the remainder of the step
> four assessment takes place in the VE's head,
> we are left with nothing to review...a VE may
> supply information to the ALJ at step four
> about the demands of the claimant's past
> relevant work...[but] the VE's role in
> supplying vocational information at step four
> is much more limited than his role at step
> five...Therefore, while the ALJ may rely on
> information supplied by the VE at step four,
> the ALJ himself must make the required
> findings on the record, including his own
> evaluation of the claimant's ability to
> perform his past relevant work.

<u>Winfrey</u>, 92 F.3d at 1025.

[4]The ALJ's findings in <u>Doyal</u> were as follows:

> The vocational expert testified that the
> claimant's past relevant work as a
> housecleaner and sewing machine operator

step four analysis, the ALJ must make findings regarding the
physical and mental demands of the claimant's past relevant work.
When the ALJ essentially skips the second phase of the step four
analysis by not making any findings regarding the physical and
mental demands of claimant's past work, either as performed or as
it is generally performed in the national economy, then the case
shall be remanded in order for the ALJ to make the specific
factual findings regarding the demands of claimant's past
relevant work.   Clardy v. Barnhart, 2004 WL 737486 at *6 (D. Kan.
Apr. 5, 2004).

     The ALJ found that plaintiff's past work was performed at
the sedentary level, and then noted that the vocational expert
testified that plaintiff's past work could still be performed by
one subject to the exertional and nonexertional limitations in

---

                    would be classified as light and unskilled,
                    and her past relevant work as an activities
                    director would be classified as light and
                    semiskilled.... The vocational expert
                    indicated that the claimant's past relevant
                    work as a housecleaner and sewing machine
                    operator did not require lifting more than 20
                    pounds, walking for prolonged periods, or
                    performing tasks requiring bilateral normal
                    grip strength.

Doyal, 331 F.3d at 760.  The ALJ found that plaintiff could
perform past relevant work as a housecleaner and a sewing machine
operator.  331 F.3d at 761.  As noted above, the ALJ cited with
approval the testimony of the vocational expert concerning the
physical demands of the 2 past jobs which the ALJ found that the
claimant could still perform.

the RFC findings.   Therefore, the ALJ concluded that plaintiff could perform past relevant work (R. at 35).

Based on the errors at earlier steps, the ALJ will have to make new findings when this case is remanded, including new findings at steps four and/or five.   On remand, it is critical for the ALJ to make the necessary findings at phase two of step four regarding the physical and mental demands of plaintiff's past work.   As the most recent case law makes clear, the failure to make such findings requires remand for proper step four analysis.   <u>Bowman v. Astrue</u>, 511 F.3d 1270, 1271-1273 (10th Cir. 2008); <u>Frantz v. Astrue</u>, 509 F.3d at 1303-1304; <u>Parnell v. Astrue</u>, Case No. 07-1292-MLB (D. Kan. July 1, 2008; report and recommendation at 14-21); <u>Kilpatrick v. Astrue</u>, 559 F. Supp.2d 1177, 1182-1185 (D. Kan. 2008)(Belot, D.J.).

IT IS THEREFORE RECOMMENDED that the decision of the Commissioner be reversed, and that the case be remanded for further proceedings (sentence four remand) for the reasons set forth above.

Copies of this recommendation and report shall be provided to counsel of record for the parties.   Pursuant to 28 U.S.C. § 636(b)(1), as set forth in Fed.R.Civ.P. 72(b) and D. Kan. Rule 72.1.4, the parties may serve and file written objections to the recommendation within 10 days after being served with a copy.

Dated at Wichita, Kansas, on September 19, 2008.

                         s/John Thomas Reid
                         JOHN THOMAS REID
                         United States Magistrate Judge